UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JAMES AUNE, CHARLES EICKOFF, NICKOLAS JENNINGES, GREGORY LARSON, THOMAS MOELLER, JOSE L. PENA, TIMOTHY SANDERS, and JONATHON WELLS, | ) ) ) ) ) ) | CIV. 09-5009 |
| Petitioners, | ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) ) | |
| ADMINISTRATOR, WAGE & HOUR DIVISION, U.S. DEPARTMENT OF LABOR, and ADMINISTRATIVE REVIEW BOARD, U.S. DEPARTMENT OF LABOR, and the UNITED STATES AIR FORCE, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) ) | |

**TABLE OF CONTENTS**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-7

**STATEMENT OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-46

    **A.**    **Petitioners' Request for Conformance** . . . . . . . . . . . . . . . .7-10

    **B.**    **The WHD's Decision to Conform Petitioners' Wage**

           **Rates (9-10-2001)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

    **C.**    **The USAF's Request for Reconsideration** . . . . . . . . . . . . . .11-12

    **D.**    **The DA's First "Final Ruling" (6-21-2002)** . . . . . . . . . . . . 13-14

**E.**    **The ARB's Order of Remand - "Bionetics I" (1-30-2004)** . . . . 14

**F.**    **The DA's Second Decision (10-31-2005)** . . . . . . . . . . . . . 15-18

**G.**    **The ARB's Affirmance - "Bionetics II" (12-16-2008)** . . . . . . . 18

**H.**    **Raw Data in 2002 Administrative Record** . . . . . . . . . . . . 18-35

**I.**    **Additional Data in Supplemental Administrative Record** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-46

**DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46-69

    **A.**    **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-50

    **B.**    **The Applicable Burden of Proof** . . . . . . . . . . . . . . . . . . 50-51

    **C.**    **Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-69

        **1.**    **Whether the DA's October 31, 2005, Decision was Arbitrary, Capricious, and an Abuse of Discretion** . .51-55

        **2.**    **Whether the DA was Required to Precisely Follow the Directives in the ARB's Order of Remand** . . . . . . . . .55-60

            **a.**    **The Law of the Case Doctrine** . . . . . . . . . . . . . 56-57

            **b.**    <u>**Brachtel v. Apfel**</u> . . . . . . . . . . . . . . . . . . . . . 57-60

        **3.**    **Whether the ARB's December 16, 2008, Affirmance was Arbitrary, Capricious, and an Abuse of Discretion** . . 60-69

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 698

**NOTICE TO PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**INTRODUCTION**

The case concerns an administrative decision by the Wage and Hour Division of the United States Department of Labor determining that Petitioners should be paid wages and fringe benefits as Electronics Technician, Maintenance II workers, a job classification contained in a directory of jobs promulgated by the Wage and Hour Division. Petitioners ask this court to reverse the agency decision, asserting that they should be classified within the Engineering Technician IV classification in the Division's directory, which classification would result in higher compensation for Petitioners retroactive to the contract start date. Petitioners timely perfected their appeal and the matter is now properly before the court. The district court, the Honorable Jeffrey L. Viken, referred the matter to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**OVERVIEW**

This case arises under the McNamara-O'Hara Service Contract Act, 41 U.S.C. §§ 351-58 ("SCA"), as implemented by the regulations at 29 C.F.R. Parts 4 and 8. The SCA applies to every contract entered into by the United States for the principal purpose of obtaining services for the United States through the use of service employees. See 41 U.S.C. § 351. If a service contract exceeds $2,500, the SCA requires contractors and subcontractors providing services pursuant to the service contract to pay wages and fringe benefits found

prevailing in the locality, or to match the rates contained in a predecessor contractor's collective bargaining agreement.  Id.  The wage and benefits provisions of the SCA are enforced by the Wage and Hour Division ("WHD") of the Employment Standards Administration within the United States Department of Labor.  The legislative policy behind the SCA is to ensure that the federal government, with its superior bargaining power, does not depress local wages in a locality in which a service contract is entered into.  See 41 U.S.C. § 351, Revision Notes and Legislative Reports.

Under a federal service contract, the contracting agency is required to notify the WHD, prior to the effective date of the contract, of the various classifications of workers to be employed under the contract.  In response to that notification, the WHD issues an initial wage determination which identifies the minimum hourly wage and fringe benefits rates that must be provided to the classifications of workers employed under the subject contract.[1]  At times, the initial wage determination leaves out a classification for an occupation which is necessary to the completion of the contract.  In that situation, the procedure for

---

[1]The initial wage determination "dictates the minimum wage to be paid to any classification of employees under a service contract and is incorporated into a particular bid."  Docket No. 15, at 15-16.  A challenge to initial wage determination rates must be made prior to the date any bids on the contract are accepted.  The procedure for setting the initial wage determination was intended to make the contract bidding process equitable, so each bidder knows the minimum wage rates which must be paid under the contract.

adding an essential classification after the contract has already been awarded is known as a "conformance."

The process for establishing a conformance is set forth in 29 C.F.R. § 4.6(b)(2). In a conformance action, the Deputy Administrator ("DA") of the WHD compares the skills and duties which are actually performed by the employees under the contract, to the skills and duties of a classification that is listed in the wage determination, and conforms the employees' wage and fringe benefit rates to the rates for that classification already listed in the wage determination. The wage and fringe benefit rates of the conformed classification shall bear a "reasonable relationship" to those rates for a classification that is listed in the initial wage determination. 29 C.F.R. § 4.6(b)(2).

At all times relevant to the present case, the Petitioners were employees of Bionetics Corporation ("Bionetics"), a company which contracted with the United States Air Force ("USAF") to provide calibration[2] and repair services in aircraft landing and piloting instruments at the Precision Measurement Equipment Laboratory ("PMEL") at Ellsworth Air Force Base in Rapid City, South Dakota. The Bionetics-USAF contract was in effect at the PMEL from October, 1997, through September, 2002, and is governed by the SCA.

---

[2]According to a Technical Order issued by the USAF, calibration is "a comparison between items of equipment, one of which is a measurement standard of known accuracy, to detect, correlate, adjust and report any variation in the accuracy of the other item(s)." 2002 Administrative Record ("AR"), Tab 7.

In this case, the Petitioners were initially classified under the contract as Electronic Technicians and Support Services Technicians (collectively Electronic Technician, Maintenance II or "ETM II" workers). They claimed that the ETM II classification was improper, and that they should have been classified instead as Engineering Technician IV ("ET") workers. Petitioners asserted that the ET IV classification encompassed the job duties and skills they performed under the contract and that this classification was not included in the initial wage determination. Accordingly, Petitioners sought a conformance action from the Secretary of the Department of Labor.

The USAF and Bionetics opposed the Petitioners' proposed conformance because they believed that Petitioners were appropriately classified in the ETM II category. Because all of the parties did not agree on whether the conformance was appropriate, the Branch of Service Contract Wage Determinations ("Branch") within the Department of Labor was obligated to resolve the matter. On September 10, 2001, the Branch decided that a conformance to the ET IV wage rate was appropriate.

The DA reconsidered the conformance after the USAF objected and requested reconsideration. The DA issued a new decision that conformed the Petitioners' wage rates to the ETM II level. The Petitioners appealed this decision to the Administrative Review Board ("ARB"), which reversed and remanded the matter for development of the record. On October 31, 2005, the

DA issued a second decision conforming the Petitioners' wages to the ETM II level. Petitioners appealed again to the ARB, but on December 16, 2008, the ARB affirmed the DA's ruling. The Petitioners then took the present appeal to the district court.

## STATEMENT OF THE ISSUES

Although the procedural history below and the fact recitation required to adequately explain the case are extensive, the case presents only three basic issues for consideration.

- Whether the DA's October 31, 2005, Decision was Arbitrary, Capricious, and an Abuse of Discretion.

- Whether the DA Was Required to Precisely Follow the Directives in the ARB's Order of Remand.

- Whether the ARB's December 16, 2008, Affirmance was Arbitrary, Capricious, and an Abuse of Discretion.

## PROCEDURAL HISTORY

### A.  Petitioners' Request for Conformance

Petitioners, who worked under the Bionetics-USAF contract as Electronics Technicians and Support Services Technicians, complained that they were not properly classified under the initial wage determination for purposes of receiving wages and fringe benefits, and requested that they be reclassified as Metrology Technicians.  Supp. AR, Tab 2.  The Petitioners believed they were being paid

too low a wage rate compared with federal employees who performed the same

duties under similar service contracts at other locations.  On November 16,

2000, Petitioners initiated a conformance action with the WHD branch office

located in Denver, Colorado.[3]  2002 Administrative Record ("AR"), Tab 1.  The

USAF and Bionetics opposed the conformance request.

In February, 2001, WHD conducted an on-site investigation of the

Ellsworth AFB PMEL and personally interviewed Petitioners about their job

duties.  2002 AR, Tab I.  WHD also reviewed Forms SF-1444, which had been

completed by the Petitioners, along with supplemental documentation they

provided in support of their conformance request.  Supp. AR, Tabs 15-19.  The

---

[3]Petitioners emphasize that the initiation of the conformance proceedings
in November, 2000, resulted only after repeated entreaties by Petitioners to
their employer, Bionetics, that Bionetics was required to submit a conformance
request on Petitioners' behalf.  The court notes that this fact is substantiated
by the record, but finds that it is irrelevant to the present discussion, since a
conformance request may be brought about in two ways: either the contracting
employer may submit a conformance request to the Department of Labor, or
the employees themselves may request an investigation by the Department of
Labor without necessitating action on the part of the employer.  See 29 C.F.R.
§§ 4.6(b)(2)(i) and (iv).

Bionetics apparently took no action to initiate a conformance, and on
November 16, 2000, the Petitioners directly requested an investigation by the
Department of Labor.  See Supp. AR, Tab 2.  Significantly, Bionetics' failure to
request a conformance could not have prejudiced the Petitioners, because a
successful conformance action would make the higher wage rate payable
retroactively to the start date of the contract.  Therefore, for purposes of the
date of retroactivity, the relevant date is the date the contract commenced, on
October 1, 1997. See Docket No. 15, at 2; 29 C.F.R. §  4.6(b)(2)(vi).

WHD also considered various "Personal Work Statements," which had been prepared by Petitioners. See Supp. AR, Tab 16.

Based on the information submitted by the Petitioners and its onsite investigation, WHD made an initial determination that Petitioners were not properly classified and that their wage rates should be conformed to the Electronics Technician (ET) job family. Supp. AR, Tab 10; 2002 AR, Tab H. Because it believed that a request by the contractor was the most expeditious method of requesting a conformance, WHD asked Bionetics to submit a conformance request. See Supp. AR, Tab 14. WHD indicated that it would set a deadline of August 13, 2001, for Bionetics to issue its formal request. Id. However, Bionetics issued a statement opposing the conformance request. Supp. AR, Tab 12.

Bionetics' statement indicated that the duties performed by the Petitioners were similar to those set forth in WHD's Service Contract Act directory of occupations ("SCA directory") under the job description of "Electronic Technician Maintenance" ("ETM"). Id. Specifically excluded from the ET job family in the SCA directory, as noted by Bionetics in its statement, are "Production and maintenance workers, including workers engaged in calibrating, repairing, or maintaining electronic equipment." Id. Bionetics stated its belief that while no conformance action was necessary as to the Petitioners, their wages were "abnormally low" and did not reflect "the

9

appropriate compensation for individuals required to perform these duties." Id.

Bionetics proposed that the hourly wage rate be "indexed to the overall increase

in wage rates" using the wage grade schedule applicable to Ellsworth AFB. Id.

The USAF also submitted an opinion as to whether the Petitioners were

properly classified. See 2002 AR, Tab H; Supp. AR, Tab 11. The USAF indicated

its belief that the Petitioners were properly classified as Electronic Technicians,

but nonetheless asked WHD to determine the appropriate wage rates for the

employees, because Bionetics and a previous PMEL contractor had both

expressed their opinions that the wage rates for Ellsworth AFB were generally

low. Id. The USAF denied that the higher-paying ET IV classification was

proper, since "the provisions of the contract call for contractor production of

equipment calibrations using detailed, written procedures provided by the

Government, equipment malfunction analysis, troubleshooting and repair, and

quality control that includes some end-of-line equipment sampling," and the

ETM II classification was "closely aligned" to those requirements. Id.

**B.     The WHD's Decision to Conform Petitioners' Wage Rates (9-10-2001)**

On September 10, 2001, WHD's Wage Determination branch indicated to

the USAF that the Petitioners' wages should be conformed to the wage rate

applicable to the Metrology Technician classification.[4]  2002 AR, Tab H; Supp.

_____

[4]The Metrology Technician position falls under the ET IV job family under
Wage Determination 1994-2486 (rev. 12), and paid a wage rate of $15.11 per
hour.  2002 AR, Tab H.

AR, Tab 11. WHD indicated that the conformance decision resulted from the on-site investigation, and that the conformed wage rate should be retroactive to the start date of the contract. 2002 AR, Tab H.

**C.     The USAF's Request for Reconsideration**

On October 1, 2001, the USAF objected to WHD's decision to conform the Petitioners' wage rates to the ET IV rate. 2002 AR, Tab G, Section 1. In so doing, the USAF indicated that in initially classifying the technicians within the ETM job family, it had relied on the "Stovall letter."[5] Id. The USAF stated that the job duties of a PMEL Technician "are the same nationwide," so it believed a consistent use of the ETM II wage rate was appropriate Id. The USAF requested that the PMEL technicians continue to be paid at the ETM II rate in accordance with the Stovall letter.

Despite the objection by the USAF to WHD's opinion, on October 19, 2001, WHD's wage determination branch indicated to the USAF that a conformance was necessary because the Metrology Technician position did not fit within any other classification on the wage determination. 2002 AR, Tab F. WHD indicated that the main problem with the Petitioners' classification was not that they were merely misclassified, but more specifically that they were

---

[5] In the Stovall letter, dated May 28, 1996, the Chief of WHD's Wage Determination Branch, Ms. Nila J. Stovall, indicated that the ETM II job classification provided an adequate comparison to the duties and skills of a PMEL contract technician employed at Maxwell AFB in Montgomery, Alabama. 2002 AR, Tab G, Section 2, "Letter dated May 26, 1996.".

improperly classified as Electronics Technicians without an applicable classification in the initial wage determination or in the SCA Directory of occupations.  Id.

On November 26, 2001, the USAF reasserted its disapproval of WHD's decision to reclassify the Petitioners to the ET IV level.  2002 AR, Tab C.  The USAF agreed that the PMEL technicians were necessary classifications not listed in the SCA area wage determinations, but explained that the necessary classification would soon be added to the SCA directory for use in future contracts.  Id.  The USAF referenced the Stovall letter again and argued that until the SCA directory could be revised, the Petitioners were properly paid at the ETM II rate.  Finally, the USAF asserted that WHD's decision to pay the technicians at the ET IV rate constituted "a departure from [WHD's] previous guidelines."  Id.; See also Supp. AR, Tab 8.

The record does not indicate the date when WHD agreed to reconsider its decision, nor as to the reasons behind WHD's change in course.  But as the DA's final rulings, dated June 21, 2002 [2002 AR, Tab A], and October 31, 2005 [Supp. AR, Tab 1], demonstrate, the DA ultimately reconsidered WHD's decision that Petitioners' wage rates should be conformed to the ET IV level and their occupation classified as Metrology Technician.

**D.     The DA's First "Final Ruling" (6-21-2002)**

On June 21, 2002, the Deputy Administrator ("DA") of the WHD, issued a revised decision which conformed the Petitioners' wages to the ETM II level. 2002 AR, Tab A.  The crux of the DA's decision was that the on-site investigation conducted by WHD found that calibration was an important aspect of the Petitioners' job duties, and that repair duties were secondary to calibration.  Id.  The DA pointed out that the SCA directory excluded from the ETM job family any worker engaged in equipment calibration, and that the wage determination issued for the contract did not include an appropriate classification for the Petitioners, based on their job duties and skills.  Id.

The DA explained that Bionetics had not followed the procedure for requesting a conformance, so WHD had conformed the wage rate on September 10, 2001, by comparing the Metrology Technician classification to the ET IV classification on the initial wage determination.  Id.  The DA went on to explain that while a conformance to the ET IV classification had been approved in other circumstances, it was not unreasonable to compare PMEL Technicians to the ETM II classification as well.  Id.  The DA approved the USAF's proposal to pay the Petitioners at the ETM II wage rate, but also explained that it was not convinced the ETM II classification was the best conformance approach.  Id. Finally, the DA recommended that the SCA directory should be revised to include an additional classification which would better encompass the job

13

duties of the Petitioners, so any future disputes about a proper classification would be dispelled.  Id.  The Petitioners appealed the DA's ruling to the ARB.

**E.     The ARB's Order of Remand - "Bionetics I" (1-30-2004)**

On appeal, the ARB found that the DA's ruling lacked an adequate explanation as to the reasons the ETM II classification was chosen over the ET IV classification.  Bionetics I, ARB No. 02-094, 2004 WL 230772, at *10 (DOL Adm. Rev. Bd).  The ARB vacated the DA's ruling and remanded the matter with instructions to the DA to develop the record in three respects:  (1) to as to the rationale for choosing the ETM II classification rather than the ET IV classification; (2) as to whether the USAF or Bionetics actually attempted to comply with 29 C.F.R. §§ 4.6 (b)(2)(i) and (ii) following the contract award to Bionetics; and (3) as to the date that WHD first discovered the conformance issue.  The DA was also instructed to consider additional evidence offered by Petitioners.  Id.

The ARB explained that although the DA was cloaked with considerable discretion in choosing between two reasonable alternatives, the DA was required to provide a "legally sufficient explanation" for the choice.  Id. at *8.  Without such an explanation, the ARB explained, the DA's decision appeared arbitrary. Id.  The ARB reversed and remanded for further action consistent with its opinion, with the SCA, and the SCA's implementing regulations.  Id. at *10.

**F.     The DA's Second Decision (10-31-2005)**

On October 31, 2005, the DA issued a decision in which it reaffirmed its previous decision to conform the Petitioners' wages to the ETM II classification, but the rationale employed by the DA differed from that in its June 21, 2002, decision.  See Supp. AR, Tab 1.

First, the DA considered the "framework for the conformance process" and pointed out the differences between a conformance action and an initial wage determination.  Id.  The DA referred to an SCA regulation which provided that an additional classification which is necessary but not listed on the initial wage determination on the contract shall " 'be classified by the contractor so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classification and the classifications listed in the wage determination.' "  Supp. AR, Tab 1 (quoting 29 C.F.R. § 4.6(b)(2)(i)).

The DA explained that the process of determining the wage rate for a proposed conformance "that bear[s] a reasonable relationship to those listed in a wage determination cannot be reduced to any single formula."  Supp. AR, Tab 1 (quoting 29 C.F.R. § 4.6(b)(2)(iv)(A)).  The DA noted other applicable regulations, which provide that

> [g]uidance may also be obtained from the way different jobs are rated under Federal pay systems (Federal Wage Board Pay System and the General Schedule) or from other wage determinations issued in the same locality.  Basic to the establishment of any conformable wage rate(s) is the concept that a pay relationship

should be maintained between job classifications based on the skill required and the duties performed.

Id.

The DA stated that the Branch of Service Contract Wage Determinations may properly approve any proposed conformance that bears a reasonable relationship to the other rates on the wage determinations.  Supp. AR, Tab 1.  If the parties to the proposal disagree as to the proper classification, the Branch may approve the approach that is most consistent with other occupations on the wage determination.  Id.  Where the Branch disagrees with the parties' proposals, it may set a conformed rate that "best approximates the rate that would have been issued if the classification had been included on the [wage determination]."  Id.  The DA explained that where the Branch unilaterally decides the conformed rate in this manner, "new survey data are not used and the conformed wage rate is based upon the slotting methodology described in 29 C.F.R. 4.51(c)."[6]

---

[6]The "slotting methodology" described in 29 C.F.R. § 4.51(c) provides the procedure for establishing a prevailing wage rate where the wage survey for a particular locality results in insufficient data for one or more job classifications that are required in the performance of a contract.  The wage rate can be established by comparing equivalent or similar job duties and skills of the classifications studied and those for which no survey data is available.  If the skill and duties attributed to the compared classifications are rated similarly under pay classification schemes, a conformance to the wage rate listed for the proposed classification may be adopted.  29 C.F.R. § 4.51(c).

In deciding any conformance dispute, the DA stated, "the principal issue that must be addressed is to determine the occupation or occupations on the wage determination that most closely compares to the proposed conformed classification in terms of duties and skills." Id. The DA explained that both the ET and ETM job families provided a reasonable relationship to the Metrology Technician classification, but that because all the parties to the conformance disagreed as to whether the ET or ETM job family should be used, the Department of Labor must decide which job family is more appropriate. Id.

The DA discussed the procedural history of the dispute up to that point, including th WHD's on-site investigation; WHD's September 10, 2001, decision that a conformance to the ET IV classification level was appropriate; and the USAF's subsequent request for reconsideration. Id.

The DA concluded that the ETM II classification provided a better reasonable relationship to the Metrology Technician position than the ET IV classification, in terms of duties and skills. Id. In making that choice, the DA said it considered the positions of all the parties and reconsidered the conformance decision in light of the regulatory framework under the SCA. Id. The DA said it also relied on the language in the SCA directory; the evidence in the record that calibration comprises the main job duty of the Petitioners; the arguments presented by the employees; and the SCA wage determination rates and the Federal Wage Board rates applicable at all the nationwide locations at

which the metrology work under the contract was performed.  Id.  Finally, the

DA pointed out that whether ETM II wage rates at Ellsworth AFB were lower

than at other nationwide locations was an insufficient basis on which to reject

the ETM II rate for the Petitioners.  Id.  On July 7, 2006, the Petitioners again

appealed the DA's ruling to the ARB.

**G.      The ARB's Affirmance - "Bionetics II" (12-16-2008)**

On December 16, 2008, the ARB affirmed the DA's October 31, 2005,

decision.  Bionetics II, ARB No. 02-094, 2008 WL 5454135 (DOL Adm. Rev. Bd).

The ARB found that it was reasonable for the DA to rely on the SCA directory to

classify the Petitioners within the ETM II job family.  Id. at *3.  The ARB also

found that a preponderance of the evidence in the record supported the DA's

factual finding that the Petitioners' primary job duty was calibration, and that

the additional evidence supplied by the Petitioners for review did not negate this

finding.  Id. at *5.  The ARB said that the DA's decision was adequately

explained and was consistent with the regulations codified at 29 C.F.R. Parts 4

and 8.  Id.  It was from this final agency decision by ARB that the Petitioners

took the instant appeal to this court.

**H.      Raw Data in 2002 Administrative Record**

This court's review of evidence is limited to a review of the administrative

record.  The administrative record is a compilation of the evidence that was

before the ARB when it decided Bionetics II, on December 16, 2008.  See Docket

No. 21. In deciding <u>Bionetics II</u>, the ARB considered the entire administrative record before it, including those documents which constituted the administrative record for its previous decision, <u>Bionetics I</u>, dated January 30, 2004. <u>Id.</u> As a result, the administrative record reviewed here includes both the <u>Bionetics I</u> record and the <u>Bionetics II</u> record.

The 2002 Administrative Record ("2002 AR") is a bound compilation of documents, separated by tabs marked with letters "A" through "R." The first document, found at Tab A, is the DA's June 21, 2002, final ruling, issued in response to a letter from Jesus Pernas-Giz, Regional Administrator of the USAF's Labor Advisors Office, which requested reconsideration of WHD's September 21, 2001, decision conforming the Petitioners' wages to the ET IV level.[7]

At Tab B is a copy of the job description for the Metrology Technician position as well as a fax transmission cover sheet, dated March 22, 2002. The cover sheet indicates that the job description document "came from the South Dakota investigative file." 2002 AR, Tab B. Ms. Annette Prindle from the Denver, Colorado Department of Labor WHD sent the fax, and indicated that she was unaware of who authored the job description. <u>Id.</u>

The job description summarizes the job duties, responsibilities, and qualifications for the Metrology Technician position. The "Summary" explains

---

[7]<u>See</u> <u>supra</u> Part D.

that Metrology Technicians "will have experience in the calibration and repair of Test Measurement and Diagnostic Equipment (TMDE) and will also be proficient in troubleshooting, repairing, inspecting, aligning, calibrating, and certifying electrical, electronic, temperature, mechanical, optical precision measurement equipment." Id. Furthermore, the description states that "a working knowledge of calibration and working standards, schematic analysis, wiring and logic diagrams, and technical publications is also required." Id.

The "Duties and Responsibilities" portion of the job description states that a qualified employee

> [i]nspects, aligns, troubleshoots, and repairs malfunctions in laboratory standards, and manual and automated common, and weapon system peculiar TMDE. Inspects TMDE for preventive maintenance, cleanliness, and safety requirements. Performs equipment maintenance using theory of operation, block diagrams, schematics, logic trees, and software diagnostics. Isolates malfunctions and repairs TMDE to the component level. Calibrates and certifies TMDE to technical data specifications ensuring traceability to reference calibration standards.

Id. The position's required "Qualifications" include knowledge of

> electrical, mechanical, physics, optics and thermal principles; mathematics, and number systems; operating principles, use, care, and repair of TMDE and laboratory standards; analysis and interpretation of technical data, including bock schematic, wiring, logic trees and troubleshooting techniques. Must have a working knowledge, and be cognizant of on-site calibration requirements utilizing Portable Automatic Test Equipment Calibrator's (PATEC) and engine test stand calibrators. Be familiar with hazardous materials and waste handling procedures in accordance with environmental standards and be aware of safety requirements and have a basic knowledge of first aid including cardiopulmonary resuscitation (CPR).

<u>Id.</u>

Tab C contains the USAF's request for reconsideration of WHD's September 10, 2001, decision, which decision conformed the Petitioners' wage rate to the "GS-7" (ET IV) level.[8]

Tab D contains a letter dated November 2, 2001, written by Kristine A. Iverson, the DOL's Assistant Secretary for Congressional and Intergovernmental Affairs, and addressed to then-United States Senator Tom Daschle. The letter acknowledged receipt of a communication dated August 17, 2001, which was signed by Senator Daschle and Senator Tim Johnson, regarding the Petitioners' wage rates.[9] 2002 AR, Tab D. Ms. Iverson's letter stated that she had been informed by WHD that the investigation into the wage rates had been completed, and that a conformance had been approved. <u>Id.</u>

At Tab E is a letter dated October 31, 2001, written by M.J. Villarreal, Jr., Administrator of the Southwest Regional Office of the DOL's WHD, addressed to Senator Daschle. The letter responded to a request by Senator Daschle's office for information about the investigation into the wage rates under the federal services contract at Ellsworth AFB. 2002 AR, Tab E. The letter stated that some of the PMEL employees "were improperly classified as electronics

---

[8]<u>See</u> <u>supra</u> Part C.

[9]At that time, Senators Daschle and Johnson were South Dakota's two United States Senators.

technician [sic]" and that the work performed by those employees was not encompassed by any classification listed on the applicable wage determination. Id.

The letter advised that the USAF and Bionetics had been informed of the results of WHD's investigation, and that both were advised to request an additional occupational classification to cover the Petitioners' jobs but that neither party agreed to do so. Id. The letter advised that WHD's investigative file had been forwarded to its national office for review, and that the national office approved the additional classification of Metrology Technician. Id. Finally, the letter advised that WHD's district office would complete the investigation and discuss any final results with Bionetics and the USAF. Id.

Tab F contains the letter dated October 19, 2001, written by Mr. Strain at the DOL and addressed to Mr. Pernas-Giz at the USAF.[10] 2002 AR, Tab F; see also Supp. AR, Tab 9.

At Tab G are four pieces of correspondence from various parties. The letters have been placed in the record in reverse chronological order, but each letter either refers to or responds to the letter preceding it in time. For purposes of clarity, the court addresses the letters in chronological order.

The earliest letter at Tab G was written on April 6, 1996, by Christopher E. Cancilla, who apparently was then employed as an electronics technician at

_____

[10]See supra Part C.

Maxwell AFB in Alabama.  Mr. Cancilla's letter, addressed to then-Congressman Terry Everett,[11] stated that his position had been incorrectly classified as Electronics Technician II, and described the difficulties he faced in obtaining a pay raise.  2002 AR, Tab G, "Letter dated April 6, 1996." The letter also set forth several questions regarding future pay increases and the wage determination survey applicable to his occupation.  Id.

The third letter at Tab G was written to Nila Stovall on April 15, 1996, by the office of Congressman Everett.  Congressman Everett's letter thanked Ms. Stovall for responding to his inquiries on behalf of Mr. Cancilla, and enclosed copies of correspondence received by his office from Mr. Cancilla. 2002 AR, Tab G, "Letter dated April 15, 1996."

The second letter at Tab G is the "Stovall Letter," dated May 28, 1996, and written by Nila Stovall to Congressman Everett.  Stovall's letter explained that WHD informed Mr. Cancilla that his job duties and responsibilities "were comparable to the Electronics Technician Maintenance II occupation. . . ." 2002 AR, Tab G, "Letter dated May 28, 1996."  Stovall explained that she advised Cancilla that the "newly established rate of $12.12 for [ETM II] would be applicable for all prospective contracts."  Id.  Stovall also described the procedure required of contracting agencies in order to ensure that the most

_____

[11]Congressman Everett was a member of the United States House of Representatives in Alabama's Second Congressional District from 1993 to 2009.  See http://www.govtrack.us/congress/person.xpd?id=400127.

current wage determinations were used in setting minimum hourly wage rates for prospective contracts.  Id.

The first letter at Tab G is the letter dated October 1, 2001, written by Mr. Pernas-Giz, to which the correspondence at Tab F responds.[12]  Mr. Pernas-Giz objected on behalf of the USAF to WHD's September 10, 2001, proposed conformance to the ET IV classification.[13]  The USAF disagreed with the decision to conform the Petitioners' wages to any rate other than the ETM II rate.  2002 AR, Tab G; Supp. AR, Tab 9.  The USAF enclosed with its letter a copy of the Stovall letter.  See Tab G, Section 2, "Letter dated May 28, 1996."

Tab H contains four documents.  First at Tab H is the conformance decision letter written by Clarence Strain of the WHD, dated September 10, 2001.[14]  2002 AR, Tab H, Section 1.

Next at Tab H is the August 28, 2001, memorandum which set forth the USAF's position on whether the Petitioners were properly classified.  The USAF prepared the memo in conjunction with WHD's on-site investigation into the Petitioners' wage rates.[15]  2002 AR, Tab H, Section 2, "Memorandum dated August 28, 2001"; Supp. AR, Tab 11.

---

[12]See supra Part C.

[13]Mr. Strain's letter of September 10, 2001, to which Mr. Pernas-Giz's letter at Tab G responded, appears in the record at 2002 AR, Tab H.

[14]See supra Part B.

[15]See supra Part A.

The third document at Tab H is the August 22, 2001, letter written by John K. Smartt, Director of Base Operations Services at Ellsworth AFB, and addressed to Richard V. Habura, District Director of the WHD branch located in Denver, Colorado.  See also Supp. AR, Tab 12.  The letter sets forth Bionetics' opinion as to the proper wage rates for the Petitioners.[16]

Tab I contains three sets of documents.  The first document is a memorandum to Nila Stovall, dated August 29, 2001, from Mr. Villarreal.  2002 AR, Tab I, Section 1. The memo serves as a cover sheet for the WHD investigative file, which is included in the 2002 Administrative Record at Tab I, Section 2.

WHD's Employment Standards Division prepared the investigative findings following its on-site investigation at Ellsworth AFB.  2002 AR, Tab I, Section 2.  The investigative findings explained that the Petitioners completed the necessary paperwork to request a conformance to the Metrology Technician classification.  Id.  The Petitioners asked Bionetics to request the additional classification of Metrology Technician, but Bionetics refused because it believed its employees were properly classified as Electronics Technicians.  Id.  The findings reported Bionetics' refusal to request the conformance prompted the investigation.  Id.

---

[16]See supra Part A.

The Petitioners were interviewed during the course of WHD's investigation.  The interviews revealed that Petitioners spent the majority of their time conducting calibrations of specialized equipment.[17]  The investigative findings also reported that "[c]alibration appear[ed] to be the important aspect [of the job] due to the sensitivity of the equipment; repair appears to be a support mechanism of the job."  The findings listed six duties which the Petitioners stated were required of them, including:  (1) calibration of test and measurement equipment; (2) comparison of instrument performance to a "standard known accuracy"; (3) correction adjustment; (4) proper calibration of equipment to meet specifications; (5) relation of quantitative information to measurements of physical and/or chemical properties; and (6) calibration to "full manufacture" specifications.  Id.

The findings noted that a contract similar to the Bionetics-USAF contract existed at Robins AFB in Georgia, and that conformances for the same technician positions were sought and approved there.  The investigative report indicated that WHD determined that the Petitioners "were not properly classified as electronic technicians and that no applicable classification existed on the

_____

[17]The investigative findings stated that the specialized equipment that the PMEL employees were charged with calibrating was "used to measure characteristics of objects, substances, or phenomena, such as but not limited to length, time, mass, temperature, electrical current, luminous intensity, and derived units of physical or chemical measure."  2002 AR, Tab I, Section 2.

current wage determination or in the SCA directory of occupation [sic]." 2002 AR, Tab I, Section 2.

The third and final section in Tab I is the "Contractor and Agency Response." 2002 AR, Tab I, Section 3. This document indicated that Bionetics believed that the wage rate then assigned to the Petitioners was "low for the area," but that it was nonetheless the proper job classification for the workers, and that the company would "propose a raise in the hourly rate for the category." Id. The recommendation made by the WHD investigators indicated that "[a]ll information gathered during the investigation supports the conclusion that the current classification does not describe the work performed by the employees. Consequently, an additional classification is required." Id.

Tab J contains various pieces of correspondence sent between the office of Senator Tom Daschle; Richard Habura of the Denver WHD of the Employment Standards Administration; and Petitioner Timothy Sanders. 2002 AR, Tab J, Sections 1-4. The letter from Senator Daschle's office urged action on behalf of the Petitioners. The letters from Mr. Habura indicated that the investigation into the wage rates would likely be completed at the end of July, 2001, and that Bionetics had agreed to request a conformance. 2002 AR, Tab J, Section 3. The letter written by Petitioner Sanders to Senator Daschle discusses the Denver WHD's decision to ask Bionetics to submit a conformance request. 2002 AR, Tab J, Section 4.

Tab J also includes an unsigned fax, dated both July 26 and 27, 2001, directed to Petitioner Sanders. 2002 AR, Tab J, Section 5, "Letter to Mr. Sanders." This faxed letter discussed the Code of Federal Regulations sections applicable to conformance procedures. Id. The letter was apparently written by a person similarly-situated to Sanders, although the author's identity is unverified in the record. The letter said that, as an electronics maintenance worker, "[w]ell yes we are doing electronic maintenance but we are doing a lot more than electronic maintenance. We are doing very precise calibrations which are traceable to NIST, we are certifying test equipment. An electronics maintenance person doesn't certify anything."[18] Id. The author asserted that the legal liability of an electronics maintenance worker was limited, but implied that legal liability for employee negligence within the course of Mr. Sanders' employment might be substantial. The author cited no legal authority for this proposition. Finally, the letter asserted that "[t]he level of expertise required [of the Ellsworth PMEL employees] far and away exceeds the water-downed [sic] job description of electronics maintenance worker." Id.; see also Supp. AR, Tab 21.

Finally, Tab J, Section 6 consists of various excerpts from Title 29 of the Code of Federal Regulations, which describe the procedures to be followed by

---

[18]"NIST" is an acronym for the National Institute of Science and Technology. The NIST is an "independent agency of the U.S. Department of Commerce charged with the improvement and maintenance of all kinds of standards. The bureau operates radio stations . . . which broadcast accurate frequency and time standards." Supp. AR, Tab 47, p. 76.

the contracting officer where there is a wage determination attached to a contract. 2002 AR, Tab J, Section 6, "Excerpts 29 Code of Federal Regulations (7-1-99 Edition)."[19]

Tab K consists of two pieces of correspondence between the office of Nila Stovall and the offices of Senators Daschle and Johnson. The letters appear in the record in reverse chronological order. The letter first in time, dated August 6, 2001, replied to a letter from Senator Johnson to Sandra Wilson Hamlett[20] [2002 AR, Tab L, Section 2] concerning the 1999 Department of Defense survey for Rapid City, South Dakota. Ms. Stovall's letter explained the procedure for issuing a wage determination as well as the procedure for requesting a conformance. 2002 AR, Tab K, Section 2.

The letter written second in time [2002 AR, Tab K, Section 1], dated August 14, 2001, was Ms. Stovall's response to a letter written by Senator Daschle on August 1, 2001. Ms. Stovall's letter enclosed a copy of the letter written to Senator Johnson [2002 AR, Tab K, Section 2]. Ms. Stovall's August 14, 2001, letter explained that the wage determination rate for the ETM II position was $12.18, and would have been set at that rate regardless of whether

_____

[19]Specifically, Tab J, Section 5 includes highlighted and underlined sections of 29 C.F.R. §§ 4.6.

[20]Sandra W. Hamlett was employed as a Supervisory Salary and Wage Specialist for the DOL's Branch of Service Contract Wage Determinations. See 2002 AR, Tab L, Section 2.

the 2002 wage determination rate or the "1999 DOD survey rate" was used. 2002 AR, Tab K, Section 1. It also explained the procedure for initiating a conformance request. The letter is nonspecific in nature and makes no mention of the Petitioners' specific job duties or skills.

Tab L contains twelve pieces of correspondence sent by and received from the office of Senator Johnson, and one document prepared by the Department of Defense. That document, found at Tab L, Section 3, is entitled "Department of Defense - NAF Pay Systems - Right on the Money." The survey summary listed the survey area, occupation title, number of employees, pay rate, weighted number, pay rate, and pay grade for 24 occupations. There is no explanation in the record as to the significance of any of the particular occupations or pay rates, nor any indication of the relevance of the document as to whether the Petitioners were properly classified. 2002 AR, Tab L, Section 3.

At Tab L, Section 2 is a letter from Senator Johnson, dated July 10, 2001. This letter inquired of Sandra Wilson Hamlett, Supervisory Salary and Wage Specialist in the Washington, DC Branch of Service Contract Wage Determinations, about the status of the investigation into the Petitioners' job classification. 2002 AR, Tab L, Section 2, "Letter dated July 10, 2001."

In response to Senator Johnson's letter, Ms. Stovall sent a letter dated August 6, 2001. 2002 AR, Tab L, Section 1. This letter is identical to that found at 2002 AR, Tab K, Section 2.

The remaining documents contained within Tab L include four letters sent to Senator Johnson from four of the Petitioners, all sent in July, 2001 [2002 AR, Tab L, Section 4]; a response from Senator Johnson sent to Clarence Strain, dated July 27, 2001 [2002 AR, Tab L, Section 5]; and other correspondence that explains the procedure for initiating a conformance action [2002 AR, Tab L, Section 6]. The letters generally advised that there was a wage dispute at Ellsworth AFB, that an investigation was ongoing, and that there was a procedure in place for requesting a wage conformance. See 2002 AR, Tab L, Section 7. The letters from the various Petitioners set forth their personal versions of the facts and their reasons for believing a conformance or pay raise is necessary. See 2002 AR, Tab L, Section 8. A copy of the unsigned letter already discussed at Tab J, Section 5, also appears at Tab L, Section 9.

Tab M contains two letters addressed to the office of Senator Daschle, as well as another exact copy of the unsigned letter to Mr. Sanders previously discussed as part of Tab J, Section 5, and Tab L, Section 9. The first letter to Senator Daschle was dated July 26, 2001, was signed by Petitioner Sanders, and is identical to a letter he previously sent to Senator Johnson and which is discussed as part of Tab L, Section 6. The second letter to Senator Daschle, dated August 3, 2001, advised that Bionetics had agreed to request a conformance on behalf of the Petitioners. Tab M also includes an exact copy of

the excerpts of the Code of Federal Regulations previously discussed at Tab J, Section 5.

Tab N contains a letter from Senator Daschle to Clarence Strain, dated August 1, 2001.  This letter explained that the Petitioners contacted the senator's office with their concerns about the dispute as to their job classifications and wages.  The letter also advised that the Petitioners were made to complete time-consuming procedural requirements which were apparently not required of similarly-situated employees at Robins AFB, whose request for reclassification of their occupations had been approved without those procedural requirements.  2002 AR, Tab N.

Tab O contains a letter from Senator Johnson's office, addressed to Clarence Strain and dated July 27, 2001.  The letter complained that the Senator's office had been working with the Petitioners to resolve the wage dispute for more than five years, and requested immediate review of the dispute. 2002 AR, Tab O.  Senator Johnson's letter referenced the correspondence contained in Tab P of the 2002 AR.

Tab P contains a letter written by Richard Habura to Senator Johnson, dated July 23, 2001.  The letter advised that WHD did not believe the Petitioners were properly classified, and that WHD would soon be completing its investigation of the matter.  2002 AR, Tab P.  Mr. Habura's letter advised that

he believed the most expeditious manner in which to proceed, following WHD's investigation, would be to ask Bionetics to formally request a conformance.

Tab Q contains a letter dated July 20, 2001, written by Mr. Habura to Senator Daschle's office to advise that an investigator, Mindy Alvarado, would be completing her investigation of the matter, at which time WHD would ask the USAF to submit a request for additional classifications for the Petitioners. The letter is substantively similar to the letter contained at Tab P.

Tab R contains excerpts of the Employment Standards Administration Wage and Hour Division's SCA directory of occupations. 2002 AR, Tab R. The excerpts consist of job descriptions for twenty different occupations, most of which are unmarked and appear to have no relevance to the issues surrounding the classification of the PMEL technicians. The following job titles were highlighted within this tabbed section of the record:

- 23180 Electronics Technician, Maintenance (Occ. Base);

-  23181 Electronics Technician, Maintenance I;

- 23182 Electronics Technician, Maintenance II;

- 23183 Electronics Technician, Maintenance III;

- Engineering Technician (Occupational Base);

- 29081 Engineering Technician I;

- 29083 Engineering Technician II;

- 29083 Engineering Technician III;

- 29084 Engineering Technician IV;

- 29085 Engineering Technician V; and

- 29086 Engineering Technician VI.

Id.

The basic requirements for the Electronics Technician, Maintenance

(ETM) occupations advised that a worker classified in any of the ETM jobs

> maintains, repairs, and installs various types of electronic
> equipment and related devices such as electronic transmitting and
> receiving equipment (e.g., radar, radio, television,
> telecommunication, sonar, and navigational aids); personal and
> mainframe computers and terminals; industrial, medical,
> measuring, and controlling equipment; satellite equipment; and
> industrial robotic devices. Applies technical knowledge of
> electronics principles in determing [sic] equipment malfunctions,
> and applies skill in restoring equipment operations.

2002 AR Tab R, p. 88-89.

The ETM II job description stated that a qualified employee

> [a]pplies comprehensive technical knowledge to solve complex
> problems by interpreting manufacturers' manuals or similar
> documents. Work requires familiarity with the interrelationships of
> circuits and judgment in planning work sequence and in selecting
> tools and testing instruments.

> Receives technical guidance, as required, from supervisor or
> higher level technician, and work is reviewed for compliance with
> accepted practices. May provide technical guidance to lower level
> technicians.

Id. at p. 89.[21]

---

[21]Because there is no argument before the court that a job classification
other than the ETM II classification or the ET IV classification is appropriate for

34

The Occupational Base requirements for the Engineering Technician (ET) job family stated that

> To be covered by these definitions, employees must meet all of the following criteria:
>
> 1.　Provide semiprofessional technical support for engineers working in such areas as research, design, development, testing, or manufacturing process improvement.
> 2.　Work pertains to electrical, electronic, or mechanical components or equipment.
> 3.　Required to have some practical knowledge of science or engineering; some positions may also require a practical knowledge of mathematics or computer science.
>
> Included are workers who prepare design drawings and assist with the design, evaluation, and/or modification of machinery and equipment.
>
> Excluded are:
> a.　Production and maintenance workers, including workers engaged in calibrating, repairing, or maintaining electronic equipment (see Maintenance Electronics Technician);
> b.　Model makers and other craft workers;
> c.　Quality control technicians and testers;
> d.　Chemical and other nonengineering laboratory technicians;
> e.　Civil engineering technicians and drafters;
> f.　Engineers required to apply a professional knowledge of engineering theory and principles.

Id. at pp. 117-18.

----

the Petitioners' employment at Ellsworth AFB, the court will not reproduce the SCA Directory's job descriptions for the job classes other than ETM II and ET IV, which are among those entries specifically highlighted in the excerpts at Tab R.

## I.     Additional Data in Supplemental Administrative Record[22]

The Supplemental Administrative Record is a bound compilation of documents, separated by tabs numbered from 1 to 47. The Respondents filed the supplemental documents on November 13, 2009, and represented that the documents were not included with the 2002 AR because they were inadvertently overlooked when the 2002 AR was first certified. See Docket No. 21. The Petitioners filed no objection to the Respondents' motion for leave to file the supplemental record, so the court assumes the documents contained therein were actually part of the 2002 AR, which was filed with the court on May 1, 2009 [Docket No. 7], and that the DA and ARB had access to the documents when they made their respective decisions in this case.

Tab 1 contains the DA's final ruling, dated October 31, 2005, which followed the ARB's order of remand (which remand order is also known as "Bionetics I"). Supp. AR, Tab 1.[23]

At Tab 2 is a letter dated November 16, 2000, signed the Petitioners, and addressed to Bionetics and the United States Department of Labor's WHD in

_____

[22]The Supplemental Administrative Record contains numerous exact duplications of documents contained in the 2002 AR. The court has omitted discussion in this section of all documents contained in the Supplemental AR which were also included in the 2002 AR and discussed above.

[23]See supra Part G.

Denver, Colorado.[24]  The letter was intended to serve as a formal conformance request.  Supp AR, Tab 2.

At Tab 3 is the DA's first "final ruling," dated June 21, 2002.[25] The document is identical to that found in the 2002 AR, at Tab A.

At Tab 4 is a memorandum written on August 9, 1994, by the USAF Legal Services Agency in response to "a request for a legal opinion on the potential liability exposure of the Air Force in using uncalibrated test, measurement, and diagnostics equipment (TMDE)."  The memorandum opined that if an accident or injury occurred as a result of the USAF's failure to properly calibrate test, measurement, and diagnostics equipment ("TMDE"), legal liability could attach and damages could be awarded to an injured party.  Supp. AR, Tab 4.

At Tab 5 is another memorandum written on June 16, 1999, by the USAF Legal Services Agency.  This memo noted that its previous opinion on the potential liability exposure of the USAF in using uncalibrated TMDE, dated August 9, 1994 [Supp. AR, Tab 4], was still valid.  Supp. AR, Tab 5.

At Tab 6 is a memorandum written by the Director of Air Force Metrology, addressed to the 28th Bomb Wing at Ellsworth AFB, noting that the PMEL at Ellsworth AFB had been assessed for and had met certain certification

---

[24]See supra Part A.

[25]See supra Part D.

requirements. Attached to the memorandum was an Executive Summary
containing the assessment results. Supp. AR, Tab 6.

At Tab 7 is a document entitled "Technical Order 00-20-14," which
described "the policy, methods and procedures for the management of the USAF
Metrology and Calibration (AFMETCAL) Program." Supp. AR, Tab 7.[26]

At Tab 13 is a copy of an email exchange between a Bionetics Site
Manager and a Bionetics Deputy Program Manager, dated August 13, 2001.
The email from the Site Manager stated that the Petitioners were advised by the
office of Senator Daschle that Bionetics had agreed to request a conformance,
and also advised that the Petitioners wanted a copy of that conformance
request. Supp. AR, Tab 13. The e-mail response from the Deputy Program
Manager stated that "no conformance was done," and that John Smart of
Bionetics called the Department of Labor, spoke with Captain Katharine
Wiemer, USAF Contracting Officer, and was working on a "consolidated
response" to the letter from Senator Daschle's office. Id.

At Tab 14 is a letter written by Mr. Richard V. Habura, District Director of
WHD, dated August 3, 2001. The letter is similar in nature to those found at

---

[26]At Tab 9 are two letters, responsive to each other and in reverse
chronological order, which are identical to the letters in the 2002 AR at Tab G,
Section 1, and Tab F. See supra Part C. Tab 10 contains the single-page
decision letter written by Mr. Strain on September 10, 2001, which is identical
to the document in the 2002 AR at Tab H. See supra Part B. The court omits
discussion of these items because they are duplicates.

2002 AR, Tabs P and Q. The letters generally advised that Mr. Habura had directed Bionetics to request a conformance.  Supp. AR, Tab 14.

Tab 15 contains the official "Request for Authorization of Additional Classification and Rate" by Petitioner Brian M. Johnson, Bionetics Laboratory Manager, requesting that his occupation be reclassified to Metrology Operations Supervisor.  The document is dated June 13, 2000.  Supp. AR, Tab 15.

Tab 16 contains the request for reclassification to Metrology Craftsman by Petitioner Jonathon M. Wells, Electronics Technician III.  Supp. AR, Tab 16. Tab 16 also contains Mr. Wells' stated rationale for the proposed classification; the SCA directory description of the Electronics Technician, Maintenance III position; a summary of the Metrology Craftsman job description, duties and responsibilities, and qualifications; a copy of the Petitioners' Performance Work Statement ("PWS"); and the "Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Wyoming Wage Area," because Mr. Wells stated that he believed no wage comparison survey could be performed with wage rates for the state of South Dakota.  Id.

Tab 17 contains the request for reclassification to Metrology Quality Evaluator by Petitioner Gregory G. Larson, Electronics Technician III.  Tab 17 includes Mr. Larson's stated rationale for the proposed classification; the SCA directory description of the ETM III position; a summary of the Metrology Quality Evaluator job description, duties, responsibilities, and qualifications; a

copy of the Petitioners' PWS; and the "Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Wyoming Wage Area," because Mr. Larson also stated that he believed no wage comparison survey could be performed with wage rates for the state of South Dakota.

Tab 18 contains the request for reclassification to Metrology Journeyman by Petitioner Timothy Sanders, Electronics Technician II. Tab 18 includes Mr. Sanders' stated rationale for the proposed classification; the SCA directory description of the ETM II position; a summary of the Metrology Journeyman job description, duties and responsibilities, and qualifications; a copy of the Petitioners' PWS; and the Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules for the Wyoming Wage Area.

Tab 19 contains the same documents found at Supp. AR, Tab 18, with the only difference apparently being that the request for reclassification at Tab 19 is signed by the Bionetics Site Manager. Supp. AR, Tab 19.

Tab 20 contains the "Robins AFB" decision letter, written by Mr. Strain, dated November 24, 1998, and addressed to the USAF Contracting Officer at Robins AFB in Georgia. The letter described conformance decisions made by WHD with respect to six job classifications which were not included in the initial wage determination with respect to a contract then in place at Robins AFB. Supp. AR, Tab 20. The letter advised that the Metrology Technician

position was being conformed to Engineering Technician (ET) IV, and that a wage rate of $14.31 was adopted for that position. 2002 AR, Tab 20.

At Tab 22 are two memoranda, both dated October 26, 2000, as well as a letter written by Petitioner Sanders, dated September 25, 2000. The first memorandum is addressed to Petitioner and the Bionetics Program Office, and written by USAF Contracting Officer Shirley A. Dowell. Supp. AR, Tab 22, Section 1. The memo responded to Mr. Sanders' request for reclassification (Form SF 1044), submitted by him on September 25, 2000. Id. Ms. Dowell advised Mr. Sanders of two courses of action with respect to his request for a conformance. First, that his employer, Bionetics, must submit a conformance request; and second, that because he was an employee who disagreed with his wage classification, Mr. Sanders could directly request an investigation by the Department of Labor's WHD. Id. The second memorandum is identical to the first, but was addressed to Petitioner Nickolas Jenniges. Id., Section 2.

The letter written by Petitioner Sanders is addressed to Contracting Officer Dowell at Langley AFB in Virginia, and requested that Ms. Dowell complete certain items on his request for classification and submit his documentation to the WHD. Supp. AR, Tab 22, Section 3. The first memo at Tab 22 was written by Ms. Dowell in response to this correspondence from Petitioner Sanders.

Tab 23 contains an undated advertisement, apparently prepared by Yulista Management Services, Inc., which sought applications for employment at nine USAF PMELs, including the PMEL at Ellsworth AFB. Supp. AR, Tab 23. The advertisement listed the knowledge and experience required of prospective employees, to include "Electronic and physical/dimensional principals; troubleshooting techniques, metrology techniques and laboratory practices; . . . ; PMEL facility requirements; . . . ; experience in inspecting, troubleshooting, repairing, modifying, overhauling, aligning, calibrating and certifying TMDE and laboratory standards . . . ." Id.

Tab 25 contains a vacancy notice posted by Bionetics on November 7, 2001, regarding an Electronics Technician II position located at a PMEL at McConnell AFB in Kansas. The posting described the "Essential Duties & Responsibilities" and the minimum requirements for potential employees with respect to technical knowledge and technical experience. The essential duties and responsibilities require that a qualified employee

> [m]aintains, repairs, and calibrates electronic and physical/dimensional test measurement and diagnostic equipment (TMDE) and laboratory standards with some experience in all areas of the precision Measurement Equipment Laboratory (PMEL). Reads and understands schematic and wiring diagrams; performs general maintenance and overhaul procedures; and uses TMDE to troubleshoot and repair systems and circuit boards to component level, to include surface-mount technology. Applies comprehensive technical knowledge to solve complex problems by interpreting manufacturer's manuals or similar documents. Is familiar with the interrelationships of circuits and judgment in planning work sequence and in selecting tools and testing instruments. Receives

42

technical guidance, as required, from supervisor or higher-level technician, and work is reviewed for compliance with accepted practices. Performs other duties as specified by the Program Manager.

Supp. AR, Tab 25.

The "Minimum Requirements" section of the vacancy notice explained that a qualified candidate

shall have knowledge of: electrical, electronics, electromechanical, mechanical, physics, optics, and thermal principles; mathematics and number systems; operating principles and TMDE and laboratory working standards; analysis of bloc, schematic, wiring, and logic diagrams and technical data; troubleshooting techniques; calibration traceability; metrology techniques, and safe laboratory practices; computer operational principles, language, and software; using, caring for, and repairing TMDE and laboratory standards.

Supp. AR, Tab 25. Furthermore, a qualified job applicant was required to have three years of experience working as a metrology laboratory technician. Id.

At Tab 27 is an undated letter addressed only "To Whom it may concern," signed by the Petitioners. The table of contents to the administrative record indicates that the letter was intended for the WHD. Supp. AR, Tab 27. The letter stated the employees' grievances about their respective wage classifications, asked questions of the DOL, and addressed issues regarding resolution of their attempts to seek reclassification or conformance. Id. Included among the Petitioners' concerns was that while their occupations represented three distinct positions, the Bionetics-USAF contract misclassified all the Petitioners together at a single wage rate. In support of their argument

in favor of conformance, the Petitioners' letter cited the Robins AFB memo [Supp. AR, Tab 20], which approved a conformance request by employees at that location.

Tabs 28-44 contain twenty-two pieces of correspondence sent by the Petitioners, various DOL officials, and South Dakota's United States Congress members. The correspondence dates from June 8, 1998, to November 2, 2001. The letters generally advised of the status of the Petitioners' wage dispute and the investigative process, and requested action on behalf of the Petitioners. Some of the letters informed the recipient as to the procedural requirements for initiating a conformance request. The letters do not set forth facts about the Petitioners' duties or job requirements which would tend to demonstrate that the ET II classification either is, or is not, an appropriate classification for the Petitioners. The letters do generally demonstrate that the dispute over Petitioners' wages had been ongoing since as early as 1998. See Supp. AR, Tab Nos. 28-44.

Tab 45 contains two documents, a graph and a chart entitled "Wages as Per Wage Determination by AFB for the Period 1993-2001." Supp. AR, Tab 45. The graph and chart illustrated the wage rates for two "Tech Levels," ET 2 and ET 3, at thirteen AFBs, including Ellsworth AFB, from 1993 to 2001. Id. The chart shows that wages for the technical positions at each of the Air Force bases generally increased over time. Although the increment that each position

increased from year to year was not the same across each of the bases, the chart shows that none of the positions' wages decreased with time.  Id.  The graph is a visual depiction of the statistics contained within the chart.  Id.

Tab 46 contains various charts and documents.  The charts are entitled "Federal Wage System Regular and Special Production Facilitating Wage Rate Schedules" for Georgia, Eastern South Dakota, North Dakota, Montana, Nebraska, and Wyoming.  The charts list the wage rate for respective "WG," "WL," and "WS" pay grades.[27]  Supp. AR, Tab 46.

Tab 46 also contains five USAF Wage Schedule documents entitled "Appropriated Fund Wage Area Determinations."  Supp. AR, Tab 46.  These documents generally note a survey area and list the areas of application for each survey.  The survey areas noted by these documents include Eastern South Dakota, North Dakota, Montana, Nebraska, and Wyoming.  These five documents contain no data about job classifications, pay rates, or any information other than the locations in each state which constitute each particular "wage area."  Id.

Tab 47 contains a reproduction of the 94-page "Measurement and Calibration Handbook, Technical Training, PMEL Specialist Course," dated May, 1997.  Supp. AR, Tab 47.  The title page of the document states that the

_____

[27]The acronym "WG" stands for Wage Grade employee; "WL" stands for Wage Leader employee; and "WS" stands for Wage Supervisor.  See http://www.dfas.mil/civilianpay/payandentitlements/federalwagefw.html.

45

handbook was "not intended for use on the job" and that it was instead intended for "AETC Course Use." Id. The heading at the top of each page of the handbook identified the handbook as the property of the 336th Training Squadron at Keesler AFB in Mississippi. Id. The editors of the handbook noted in a foreword that the guide was "established as a training aid for student [sic] attending all Metrology Courses." Id.

The handbook is divided into four sections, entitled (1) General Information; (2) Mathematics; (3) Physical-Dimensional; and (4) Electronic Principles. Supp. AR, Tab 47. There is a lengthy glossary at the end of the handbook. There is no indication in the record as to whether the Petitioners relied on the handbook or used it at any time, or whether the Petitioners were required to train with the handbook or be responsible for any of the principles therein. Supp. AR, Tab 47.

## DISCUSSION

### A.    Standard of Review

This case arises under the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), as amended, 41 U.S.C. §§ 351 et seq., and the federal regulations codified at 29 C.F.R. Parts 4 and 8 (1999). The SCA sets forth wage protections to employees of federal service contractors. The Secretary of Labor has the authority to carry out the provisions of the SCA, as well as to make rules, regulations, and decisions in enforcing the SCA. See 41 U.S.C. §§ 352-58.

However, the Secretary of Labor has delegated the authority to issue final agency decisions in cases arising under the SCA to the ARB. Secretary's Order 2-96, 61 Fed. Reg. 19978 (May 3, 1996).

Because the SCA itself does not provide for federal judicial review of final agency decisions in cases arising under the SCA, the Administrative Procedure Act ("APA") provides the sole basis for a district court's review of final agency decisions. 5 U.S.C. §§ 702, 704. Under the APA, the ARB must uphold the WHD's findings unless they are "contrary to the law or unsupported by substantial evidence" in the record as a whole. See Meehan Seaway Serv. Co. v. Director, Office of Workers' Compensation Programs, 125 F.3d 1163, 1166 (8th Cir. 1997), cert. denied, 523 U.S. 1020 (1998) (internal citations omitted); see also 5 U.S.C. §§ 706 (2)(A), (E). A district court's review of the ARB's decisions is governed by the same standard of review. See Robinson v. Missouri Mining Co., 955 F.2d 1181, 1183 (8th Cir. 1992).

The standard of review to be applied to judicial review of administrative action taken pursuant to a regulation issued to implement a federal statute depends on whether the regulation is legislative or interpretive in nature. Hess v. Citibank, (South Dakota), N.A., 459 F.3d 837, 842 (8th Cir. 2006) (quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)); Fort Hood Barbers Ass'n v. Herman, 137 F.3d 302, 307 (5th Cir. 1998). Where the regulation is legislative in nature, the court may set aside the ARB's

decision only if it is arbitrary, capricious, constitutes an abuse of discretion, or

is otherwise not in accordance with the law. <u>Chevron, U.S.A., Inc.</u>, 467 U.S. at

844. A regulation is legislative if it was " 'issued under a specific grant of

authority to prescribe a method of executing a statutory provision.' "[28] <u>See</u>

<u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. 16, 24 (1982)(quoting <u>Rowan Cos.</u>

<u>v. United States</u>, 452 U.S. 247, 253 (1981)).

Here, the respective decisions issued by the DA and the ARB were based

on the Secretary's regulation setting forth the procedure to determine the proper

wage rate for a conformed classification. <u>See</u> Supp. AR, Tab 1; 29 C.F.R.

§ 4.6(b)(2). As noted above, the Secretary has authority to make rules,

regulations, and decisions in enforcing the SCA. <u>See</u> 41 U.S.C. § 353(a) (1987).

In this case, the regulation upon which the ARB's final decision was made is

legislative rather than interpretive in nature, and therefore the "arbitrary and

capricious" standard applies to this court's review of the agency's action.

<u>Minnesota v. Centers for Medicare and Medicaid Services</u>, 495 F.3d 991, 996

(8th Cir. 2007) (quoting <u>Baptist Health v. Thompson</u>, 458 F.3d 768, 773 (8th Cir.

2006) ("Under the APA, the Secretary's decision is 'set aside if it is arbitrary,

---

[28]Conversely, where the regulation is merely interpretive in nature,
promulgated pursuant to a general grant of authority to prescribe regulations,
the court must review the ARB's decision to determine whether it was
reasonable and "harmonizes with the plain language of the statute, its origin,
and its purpose." <u>See</u> <u>Ft. Hood Barbers Ass'n,</u> 137 F.3d at 307 (citing <u>Snap-</u>
<u>Drape, Inc. v. Comm'r</u>, 98 F.3d 194, 197 (5th Cir. 1996)).

capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law' ")).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Furthermore,

> [w]hether an agency's action is arbitrary and capricious depends on whether "the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Mausolf v. Babbitt, 125 F.3d 661, 669 (8th Cir.1997) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The court is not to substitute its judgment for that of the agency. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. However, the agency must articulate a "rational connection between the facts found and the choice made." Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

Furthermore, the district court's review of the agency's decision is limited to the record available to the ARB at the time it issued its decision. Robinette v. Commissioner of Internal Revenue Service, 439 F.3d 455, 459 (8th Cir. 2006)(quoting United States v. Carlo Bianchi & Co., 373 U.S. 709, 714-15 (1963)). The district court must accept any factual findings made by the agency if they are supported by a preponderance of the evidence. Fort Hood Barbers

Ass'n, 137 F.3d at 307; <u>Williams v. U.S. Dept. of Labor</u>, 697 F.2d 842, 844 (8th Cir. 1980).

**B.     The Applicable Burden of Proof**

Petitioners correctly state that in challenging the ARB's final ruling on a conformance request, the burden is theirs to affirmatively demonstrate that the DA's choice was unreasonable.  <u>South Dakota v. United States Dept. of Interior</u>, 423 F.3d 790, 800 (8th Cir. 2005) (citing <u>United States v. Massey</u>, 380 F.3d 437, 440 (8th Cir. 2005)(stating that to successfully challenge the final action of an administrative agency, "[t]he burden is on the plaintiff to prove that the agency's action was arbitrary and capricious.")); <u>National Wildlife Federation v. Harvey,</u> 574 F. Supp. 2d 934, 947 (E.D. Ark. 2008).  Merely showing that there were other classifications available, or even classifications which were *preferable* to the classification made by the DA, is insufficient to justify reversing the DA's decision.  <u>ERC/Teledyne Brown Engineering</u>, ARB Case No. 05-133, at 8 (Jan. 31, 2007).

Keeping in mind the foregoing standard of review and the applicable burden of proof, the court now turns to the Petitioners' arguments, the Respondents' counter-arguments, and considers whether the Petitioners have met their burden, with respect to any of their claims, to show that the DA's decision and the ARB's affirmance was arbitrary and capricious.

**C.    Arguments**

**1.    Whether the DA's October 31, 2005, Decision was Arbitrary, Capricious, and an Abuse of Discretion**

The Petitioners argue that the DA's decision of October 31, 2005, was unreasonable and an abuse of discretion. The Petitioners make two main arguments with respect to this claim. First, they assert that the DA's finding that their primary job function was calibration, rather than metrology, was overly simplistic, and that the ET IV classification was therefore the only reasonable choice. Docket No. 15, at 17-19. Petitioners urge that a review of both their "Statement of Work" [Supp. AR, Tab 7[29]] and Professional Work Statements [Supp. AR, Tab 17] demonstrates that metrology principles "supersede and precede the precise task of calibration." Docket No. 15, at 18. Second, the Petitioners claim that the DA improperly adopted an analysis previously made by Bionetics which was "rejected out of hand" by WHD in 2001; namely, that specific language in the SCA directory excludes Petitioners from classification within the ET IV job family. Id. at 19. Finally, the

---

[29]Petitioners' brief [Docket No. 15, at 18]refers the court to a "Statement of Work," apparently to be found at Tab 7 of the Supplemental Administrative Record. However, Tab 7 contains the Technical Order which describes "the policy, methods and procedures for the management of the Air Force Metrology and Calibration (AFMETCAL) Program." See Supp. AR, Tab 7. The technical order states that "[t]he PMEL is the base-level AFMETCAL Program focal point. It is the activity authorized to possess and use base measurement standards." Id.

Petitioners assert that they have met their burden to establish that the DA's decision was unreasonable and an abuse of discretion.  Id. at 20-23.

The Respondents counter that the DA properly considered the regulatory framework for the conformance process, and that the DA issued its decision after comparing the conformed classification to the occupations listed in the wage determination, which process is provided for in the regulations.  Docket No. 23, at 14-15; See Supp. AR, Tab 1; 29 C.F.R. § 4.6 et seq.  Respondents argue that the record shows the DA's decision was therefore *per se* reasonable. Docket No. 23, at 14-15.

The court finds that substantial evidence in the administrative record supports the DA's October 31, 2005 decision.  It appears from the record that a working knowledge of metrology and metrological principles is necessary to perform the act of calibration of equipment. However, the Petitioners' argument that reversal is required on grounds that metrology constitutes a primary job function ultimately fails.  Petitioners direct the court to no indicator in the record that "metrology" is a job skill, much less that metrology constitutes the Petitioners' primary job skill.

Moreover, even if metrology could be considered Petitioners' primary job duty or skill, Petitioners have not demonstrated that this basis justifies a conformance to the ET IV classification.  The regulations applicable to conformance decisions place no emphasis on a worker's "primary job function."

Instead, the DA must decide a conformance issue based on a classification that bears a reasonable relationship to a classification listed on the initial wage determination, based on a comparison of all the duties and skills required of each classification.  See 29 C.F.R. § 4.6(b)(2).

Even if the court accepts that metrology could be considered a job skill or duty, Petitioners' argument that the DA failed to discuss the Petitioners' job skills also fails.  The DA's conclusion states in no uncertain terms that "the ETM job family provides a better 'skill comparison' to the duties of the Metrology Technician occupation."  Supp. AR, Tab 1.  The DA stated that in making its decision, it considered the position descriptions in the SCA directory, the investigative file, the positions of the parties, the administrative record, and the applicable federal regulations.  Id.

The position descriptions in the SCA directory include detailed information about the required skills and job duties for both the ETM and ET job families, but the categories are not specifically listed as either "duties" or "skills."  For example, the job vacancy announcements phrase occupational requirements in terms of "qualifications," "essential duties and responsibilities," and "requirements."  Supp. AR, Tab 25. The position description for the Metrology Technician classification, proffered in support by the Petitioners, includes headings such as "Duties and Responsibilities" and "Qualifications." Supp. AR, Tab 26.  Nowhere in the position description is the word "skills" used.

Id.  The court will not second guess the DA's decision based solely on the Petitioners' allegations that because the DA failed to use the word "skills," that their job skills were not considered.  All of the documents the DA considered clearly delineate the job responsibilities, duties, and skills required of a qualified employee, though the category headings on those documents are not restricted to "Duties" and "Skills."

The court also rejects Petitioners' argument that reversal is required based on the DA's use of an analysis previously offered by Bionetics to explain why it believed no conformance was necessary.  The fact that Bionetics relied on the SCA directory in 2001 in opining that no conformance to ET IV was necessary is irrelevant to whether the DA's October 31, 2005 decision is arbitrary, capricious, or an abuse of discretion.  Petitioners cite no authority to support the proposition that Bionetics' use of the SCA directory has any bearing on whether the DA's decision was unreasonable.  Petitioners similarly cite no authority showing the impropriety of the DA's using the SCA directory to compare occupational classifications.  The regulations specifically provide that the approach used by the DA to establish wage and fringe benefit rates will vary depending on the circumstances of each case, and that the DA's guiding concept should be a comparison of skill required and duties performed.  29 C.F.R. § 4.6(b)(2)(iv)(A).  Use of the job descriptions contained in a directory promulgated by the SCA itself, accompanied by consideration of the employees'

own statements about their skills and job duties, is a patently reasonable way for the DA to make this required comparison.

The court finds that the Petitioners have not met their burden to affirmatively demonstrate that the DA's choice of the ETM II classification was unreasonable or an abuse of discretion. Petitioners offer no argument or authority to demonstrate that they actually met the full range of substantial job requirements for the ET IV job family. See 2002 AR, Tab R, pp. 117-18. Petitioners have not pointed to factual support in the record to indicate that metrology constitutes their primary job skill, which evidence might tend to negate WHD's finding that they were primarily engaged in calibration. By the same token, the Petitioners have not demonstrated why a classification in the ET IV job family is proper, when the SCA directory explicitly excludes from that job family all workers engaged in calibration, and Petitioners admit they are, at a minimum, engaged in calibration duties. More is required of Petitioners before this court may reverse the DA's decision.

**2. Whether the DA was Required to Precisely Follow the Directives in the ARB's Order of Remand**

The Petitioners argue that the DA's October, 31, 2005, decision "failed to even remotely comport" with the ARB's order of remand, and that this circumstance requires that this court find the decision to be arbitrary, capricious, and an abuse of discretion. Docket No. 15, at 24-27. Petitioners cite no authority for the proposition that the DA was limited in scope by the

55

ARB's order of remand.  The Petitioners make no argument demonstrating the proper course of action where the DA "fails to even remotely comport" with an order of remand.  Id.  Although the court could properly reject Petitioners' argument for failure to cite authority, the court will nonetheless consider the argument under the rubric of the "law of the case" doctrine.

The Respondents specifically addressed the law of the case doctrine, but they argue that it has no applicability to the facts of this case, where no final adjudications were made by the ARB, but by which findings, if they *had* been made, the DA would have been bound on remand.  See Docket No. 23, at 24.  The Respondents assert that, even if factual findings had been made by the ARB, it is uncertain whether the DA's review of prior agency decisions would be limited by those findings.  Id.

###         a.        The Law of the Case Doctrine

Under the law of the case doctrine, "a decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice."  United States v. Stuckey, 255 F.3d 528, 530 (8th Cir. 2001) (quoting United States v. Bartsh, 69 F.3d 864, 866 (8th Cir. 1995) (internal citations omitted)).  The doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages

in the same case." <u>United States v. Washington</u>, 197 F.3d 1214, 1216 (8th Cir. 1999) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983)).

**b.    Brachtel v. Apfel**

The Eighth Circuit has held that the law of the case doctrine applies to administrative agencies following an order of remand. <u>Brachtel v. Apfel</u>, 132 F.3d 417, 419-20 (8th Cir. 1997). In <u>Brachtel</u>, a dispute over Social Security benefits, the Administrative Law Judge ("ALJ") denied benefits and found that the claimant did not need to take naps during the day. <u>Brachtel</u>, 132 F.3d at419. The district court reversed the ALJ's decision on appeal and remanded the case with directions to the ALJ to completely develop the record and reconsider the case. <u>See</u> <u>id.</u> On remand, the ALJ again denied benefits and again made a specific finding that the claimant did not require naps during the day. <u>Id.</u> The district court affirmed this second decision of the ALJ. <u>Id.</u>

On appeal to the Eighth Circuit, the claimant argued that the ALJ violated the instructions given to it by the district court for remand. <u>Id.</u> The claimant argued that by remanding the case with directions to develop the record, the district court made an implicit finding that the claimant did in fact need to take naps during the day, and that the ALJ's subsequent finding to the contrary violated the direction given it by the district court. <u>Id.</u>

The Eighth Circuit held if the district court made any actual factual findings, the ALJ would be bound by those findings on remand. <u>Brachtel</u>, 132

F.3d at 419-20.  However, the court held that the district court made no such finding with respect to whether the claimant required daily naps, and that the law of the case doctrine was therefore inapplicable.  Id. at 420.  The Eighth Circuit explained that the district court:

> did not specifically instruct the ALJ to proceed on remand based upon a finding of fact that Brachtel needed to lie down.  The court simply instructed the ALJ to create a full and proper record . . . . Finally, the District Court affirmed the ALJ's denial of benefits the second time around.  In doing so, the District Court necessarily rejected the argument that the ALJ was compelled by its previous order that Brachtel needed to lie down throughout the day.  The District Court knew its original intent in remanding the case, and we will defer to the District Court's construction of its own order.

Id. at 419-20.

The court's decision "makes clear that the [remanding body] is best able to determine whether its mandate has been violated by an [administrative agency] on remand, and that [the reviewing court] will defer to the [remanding court's] interpretation of its own remand order."  Steahr v. Apfel, 151 F.3d 1124, 1126 (8th Cir. 1998) (citing Brachtel, 132 F.3d at 420).

In the present case, the ARB remanded the DA's decision "for further action consistent with [Bionetics I], the SCA, and the implementing regulations."  Bionetics I, ARB Case No. 02-094, 2004 WL 230772, at *10 (Jan. 20, 2004). The ARB stated that the DA's decision lacked an adequate explanation for the choice of the Stovall letter over the Strain decision.  Id.  The ARB also concluded that there was no evidence in the record as to whether the USAF or Bionetics

made any efforts to comply with 29 C.F.R. § 4.6(b)(2)(i) and (ii) following the award of the contract to Bionetics. Finally, the ARB stated there was no indication of how and when WHD "first discovered the conformance issue, within the meaning of Section 4.6(b)(2)(vi)." Id. Accordingly, the ARB directed the DA to "further develop the record to address [whether there was compliance with § 4.6(b)(2)(i) and (ii)] as well as the various factors that are relevant to setting the wage rate under Sections 4.6(b)(2)(i), (ii), and (iv)." Id.

Based on the language found in the ARB's decision remanding the matter, this court finds there were no specific factual findings made by the ARB in ordering the case remanded for further development and consideration of the record. Instead, the ARB explained that in order for the DA's decision to be sustained, factual development was necessary. There was no directive by the ARB that the DA was to proceed on the basis of certain explicit findings, nor were there any implicit findings by the ARB that the DA's decision was correct or incorrect. Instead, the ARB merely indicated that the case should be remanded for the DA to "develop the record and adequately explain the June 21, 2002, final ruling." Bionetics I, 2004 WL 230772, at *7. Therefore, this court finds that the DA was not bound on remand by any particular factual findings.

This court also believes that the ARB's subsequent affirmance of the DA's June 21, 2002, decision to conform the Metrology Technician position to the ETM II wage rate demonstrates that the ARB necessarily rejected any argument

that the DA violated its instructions for remand.  See Brachtel, 132 F.3d at 419-

20.  The ARB knew its original intent in remanding the matter, and deference is

due the ARB in its construction of its own remand order.  This court's proper

role is to defer to the ARB's interpretation of whether its order of remand was

violated.  See id.  Accordingly, this court finds no merit to Petitioners' argument

that the ARB's order of remand bound the DA to certain factual findings with

respect to (1) the choice between the Stovall and Strain decisions; (2) whether

there was compliance with 20 C.F.R. §§ 4.6(b)(2)(i), (ii), and (iv); and (3) as to the

time period that WHD first knew about the conformance dispute.

### 3.  Whether the ARB's December 16, 2008, Affirmance was Arbitrary, Capricious, and an Abuse of Discretion

The Petitioners urge the court to find that the ARB's decision is arbitrary,

capricious, and an abuse of discretion for six reasons.  Docket No. 15, at 27-34.

First, the ARB failed to discuss the Petitioners' attempts to initiate a

conformance action, beginning in November, 2000, and their numerous

contacts with the South Dakota Congressional delegation.  Id. at 28.  Second,

the ARB failed to discuss the USAF's assertions of reliance upon the 1996

Stovall decision.  Id. at 29.  Third, the ARB failed to mention the untimeliness of

the USAF's request for reconsideration of WHD's September, 2001, conformance

decision.  Id. at 29.  Fourth, the ARB's decision failed to follow the regulatory

framework set forth in the SCA, in that the ARB did not analyze the Petitioners'

job skills and duties.  Id. at 29-30.  Fifth, the ARB summarily adopted the DA's

decision without adequate explanation.  Id. at 31.  Finally, the Petitioners fault the ARB for failing to discuss the USAF's and Bionetics' noncompliance with the provisions of the SCA, specifically 29 C.F.R. §§ 4.6(b)(2)(i) and (ii), prior to the date the contract was awarded in 1997.  Id. at 29.

The Respondents argue that the ARB gave proper deference to the DA's decision, since the ARB reviews agency decisions only to determine whether they are consistent with the SCA and its regulations, and to determine whether the exercise of discretion by the DA was reasonable.  Docket No. 23, at 13-14. According to the Respondents, the ARB found that the DA's decision employed an objective and reasonable rationale, that the DA's decision was adequately explained and supported by the record, and that the decision was consistent with federal regulations.  Id. at 14.  The Respondents assert that the Petitioners' argument that their rate of pay is simply too low does not constitute grounds for reversal of the ARB's decision, and that their claims of procedural error are without merit and have no bearing on whether the ARB's decision should be upheld.

The Respondents admit that there are arguments to be made for conforming the Petitioners' wage rates to either the ETM job family or the ET job family.  They emphasize, however, that the Petitioners have not presented sufficient argument or factual support to "demonstrate that the levels of skill, experience, education, and training required of [the ET IV classification] are so

dissimilar from those of the [ET II classification] that the Administrator's choice of classification was unreasonable." Docket No. 23, at 19 (quoting In the Matter of Andrew Aiken, ARB Case No. 08-009, 2009 WL 1176485, at *5 (April 30, 2009)). The court will address the parties' respective arguments in turn.

First, the court finds that the ARB's failure to address the Petitioners' numerous attempts to initiate a conformance action by sending letters to senators, USAF personnel, or Bionetics supervisors has no bearing on the reasonableness of the ARB's affirmance. The Petitioners' burden is to demonstrate that the DA's choice of the ETM II classification (and the ARB's affirmance of that decision) was unreasonable. The date the conformance action was initiated is simply irrelevant to the DA's choice.[30] The Petitioners' communications with Bionetics, the USAF, and United States Senators were insufficient to initiate a conformance request under the regulations, and serve no useful purpose in determining whether the choice of the ETM II classification was arbitrary, capricious, or an abuse of discretion.

---

[30]As the court noted in footnote three of this report, a conformance can be initiated in either of two ways. First, the contracting employer (Bionetics) could have submitted a request directly to the Department of Labor. Second, the employees could have directly requested an investigation by the Department of Labor. See 29 C.F.R. §§ 4.6(b)(2)(i) and (iv). Because Bionetics refused to initiate a conformance request, the Petitioners' letter to WHD, dated November 16, 2000, served to notify WHD that an investigation was necessary into whether a conformance was appropriate. See Supp. AR, Tab 2. Regardless of whether the conformance action was initiated by Bionetics or its employees, the retroactivity of any successful conformance action is the same. See 29 C.F.R. § 4.6(b)(2)(vi).

Second, the Petitioners urge the court to reverse the ARB based on the lack of evidence in the record that the USAF actually relied on the 1996 Stovall decision to classify Robins AFB workers in the ETM II classification. Docket No. 15, at 29. The Respondents have not specifically addressed whether the USAF actually relied on the Stovall decision, nor whether such reliance has any bearing on the DA's or the ARB's respective decisions.

The court finds that whether the USAF actually relied on the Stovall decision has no bearing on whether the ARB's 2008 decision was arbitrary and capricious. The administrative record clearly demonstrates that in certain situations, WHD has found the appropriate classification in a conformance action to be the ETM II job family, and that in other situations, WHD has found the appropriate classification to be the ET IV job family. The Petitioners are charged with demonstrating that the choice of the ETM II classification in their case is arbitrary and capricious. The Petitioners have failed to show how reliance (or lack thereof) on the Stovall letter in initially classifying Petitioners bears in any way on the reasonableness of the DA's choice of the ETM II job classification. In Bionetics I, the ARB rejected the USAF's claim of equitable reliance on the Stovall letter because there was no indication from the record that either the USAF or Bionetics followed 29 C.F.R. §§ (B)(2)(i) or (ii), and neither party has objected to that ruling in this appeal. See Bionetics I, 2004 WL 230772, at *9.

Even if Petitioners had affirmatively shown that the USAF did *not* rely on the Stovall letter, the court would find that the issue is irrelevant. The parties' motives behind choosing an initial classification are of no consequence to the DA or the ARB. Instead, the DA is to make a comparison of the job skills and duties of the proposed classification with the job skills and duties performed under the contract, and to choose the classification that bears a reasonable relationship to one found in the initial wage determination.

Third, the Petitioners ask the court to reverse the ARB based on the USAF's "untimely" request for reconsideration in 2001.[31] But as Respondents correctly explain, there is no requirement of "timeliness" in requesting a reconsideration of a conformance decision. The USAF was free to request reconsideration at any time, and the administrative agency was free to reconsider its final decision for error within a reasonable time. See 5 U.S.C. § 555(b) ("[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.").

Fourth, the Petitioners claim that the ARB must be reversed because it failed to analyze their job duties and skills. Docket No. 15, at 29. However, the ARB's role on appeal is to only determine whether a preponderance of the evidence supports the DA's decision. 29 C.F.R. § 8.9(b). The ARB is not to

---

[31]See supra Part C.

undertake a *de novo* review of questions of fact, and must affirm the DA's decision if it is reasonable and consistent with the law.  See Iowa Util. Bd. v. FCC, 120 F.3d 753, 793 (8th Cir. 1997) (citing Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984)).

To that end, the ARB expressly stated that it found a preponderance of the evidence supported the DA's finding that the Petitioners were primarily engaged in calibration.  Bionetics II, 2008 WL 5454135, at *6 (DOL Adm.Rev.Bd.).  The ARB considered the evidence in the record regarding the Petitioners' "wide variety of duties," including "calibrating specialized equipment."  Id.  The ARB noted the DA's findings that Petitioners performed

> calibration of test and measurement equipment, comparison of instrument performance to a standard known accuracy, correction adjustment to minimize errors, proper calibration of equipment to meet specifications, relating quantitative information to measurements of physical and/or chemical properties, calibration according to standards traceable to the National Institute of Standards and Technology, and calibrations to "full manufacture" specifications.

Id.  The ARB found that a preponderance of the evidence supported these findings by the DA.  Id.  This court finds that the ARB properly considered the evidence in the record before it, and was not required to engage in a *de novo* review of the Petitioners' job skills or duties.  The Petitioners' argument that the ARB should have undertaken a new analysis of the Petitioners' skills and duties necessarily fails.

Fifth, the Petitioners urge this court to reverse the ARB based on Petitioners' belief that the ARB summarily accepted the DA's decision without adequate explanation.  Docket No. 15, at 31.  The Petitioners base this argument on the premise that the DA was bound by explicit findings of fact following Bionetics I, the ARB's initial order of remand.  As already discussed, however, there were no explicit findings of fact passed down in Bionetics I to which the DA was bound on remand.[32]  Moreover, the ARB expressly stated in Bionetics II that it believed its order of remand had *not* been disregarded by the DA.  Bionetics II, 2008 WL 5454135, at *7.  In Bionetics II, the ARB discussed in detail the DA's decision, and the rationale advanced to support it.  Finding the DA's decision to be reasonable, the ARB was obliged to uphold the decision.  The Petitioners having advanced no factual support to demonstrate that the ARB's affirmance was arbitrary or capricious, this court finds the ARB's decision, and the rationale offered for upholding the DA's decision, to be reasonable.

Finally, Petitioners suggest that their opponents consciously employed a strategy of noncompliance to ensure that the Metrology Technician classification was not included in the initial wage determination because the process for later achieving a conformance is restrictive and is accorded limited review by the

---

[32]See Discussion supra Parts B 1. and 2.

ARB.  <u>See</u> Docket No. 15, at 4-15.  This court has found no indication in the

record either of Bionetics' or the USAF's actual compliance with 29 C.F.R.

§§ 4.6(b)(2)(i) and (ii), nor of any untoward conduct on the part of either party

that would suggest they consciously *avoided* compliance with the applicable

regulations prior to the start date of the Bionetics-USAF contract.  Accordingly,

the court rejects Petitioners' invitation to reverse the DA's 2005 decision and the

ARB's 2008 affirmance on these grounds.

The court notes that the proper remedy for noncompliance with the

provisions of the SCA would not be for the court to reverse a conformance

decision and retroactively grant a pay increase for the term of the contract at

issue.  Instead, if the USAF and/or Bionetics were found to have violated the

SCA by failing to request a conformance under 29 C.F.R. § 4.6(b)(2)(i) and (ii),

the SCA contains various administrative remedies to which the USAF and

Bionetics would be subject.  <u>See</u> 41 U.S.C. §§ 352, 354.  Reversing a previously-

issued conformance decision is not among the remedies listed in the regulations

for violating provisions of the SCA.  <u>Id.</u>

The Petitioners have presented no convincing argument or factual support

that would demonstrate that the levels of skill, experience, education, and

training required of the ET IV are so dissimilar from those of the ETM II that the

Deputy Administrator's choice of the ETM II classification was unreasonable.

Moreover, the Petitioners have not met their burden of showing that the

explanation provided by the DA for its final decision runs counter to the evidence before the agency, nor that the DA's choice of the ETM II classification is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

After a thorough review of the record, it is clear that the Petitioners' job descriptions contain some overlap with both the ET and ETM classifications. If this court were free to make a *de novo* decision as to which classification Petitioners should be conformed, the court may well have chosen the ET classification. But this court is not free to write upon a blank slate. Instead, this court's role is limited by the APA to review the agency's decision for arbitrariness, abuse of discretion, or clear error. The agency committed none of these mistakes.

Finally, the administrative record in this case demonstrates that wage rates at Ellsworth AFB were lower than at other localities around the nation. This is not grounds for reversal. Instead, it is in keeping with prevailing wages in all manner of occupations in South Dakota as compared with other states in our nation. The purpose of the SCA is not to ensure uniformity of wages nationwide, but rather to ensure that wages paid under a federal service contract are not lower than wages for similar jobs in that locality. That policy behind the enactment of the SCA is, unfortunately, served all too well by the

agency's final decision in this case. Accordingly, this court respectfully recommends affirmance of the agency's decision below.

## CONCLUSION

Because this court the DA's interpretation of 29 C.F.R. § 4.6(b)(2)(iv)(A) to be reasonable, the court finds that the ARB's affirmance of the DA's decision was not arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law. Accordingly, the court recommends that the district court enter an order affirming the decision of the Administrative Review Board, which in turn upheld the decision of the United States Department of Labor's Wage and Hour Division to conform the Petitioners' wage and benefits to the Electronic Technician, Maintenance II classification.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. <u>See</u> 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72 (b)(2). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court. <u>See</u>

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated June 28, 2010.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE